

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-75,358
---

### JOE LUNA, Appellant

### v.

### THE STATE OF TEXAS

---
### ON DIRECT APPEAL
### FROM CAUSE NO. 2006-CR-0033 IN THE 379TH DISTRICT COURT
### BEXAR COUNTY
---

**HERVEY, J., filed a concurring opinion in which WOMACK and JOHNSON, JJ., joined.**

### CONCURRING OPINION

In point of error thirteen, appellant claims that the trial court erred in denying appellant's "motion to suppress an impermissibly suggestive identification which created a substantial likelihood of misidentification at trial." While I join the majority's disposition of this point of error, I write separately to emphasize my concern about the identification procedure employed.

As we stated in *Barley v. State*, 906 S.W.2d 27, 33 (Tex.Cr.App. 1995), "[s]uggestiveness may be created by the manner in which the pre-trial identification procedure is conducted, for

example by police . . . suggesting that a suspect is included in the photo array." The record from the suppression hearing reflects that appellant was not a suspect when Detective Leonard began showing pictures to appellant. When appellant later became a suspect, Leonard showed Tovar a six-person photo array with appellant's picture in it. Here, Leonard's testimony reveals:

Q. [STATE]: And when you presented that photo lineup to Mr. Tovar, how did you present it to him?

A. [DETECTIVE LEONARD]: I–I sat it down in front of him and I told him, Okay, there's a suspect in this lineup. I can't tell you who it is. Let me know if there's anybody that looks familiar to you.

Q. You told him there was a suspect in the lineup?

A. We have–we have a suspect and we've placed him in the lineup, and let me know if there's anybody that looks suspicious to you. I'm sorry. Excuse me. That looks familiar to you.

Q. And did he recognize anyone?

A. As I was laying it down, he pointed to [appellant] and said, That's him.

Very soon after this, the State continued to question Leonard on whether he told Tovar that there was a suspect in the six-person photo array.

Q. Detective Leonard, I'm going to ask you to look at page four of your report, the entry that's dated August 11th of 04, 15:17 hours.

A. Okay.

Q. In there–do you have in your report that you told [Tovar] that there was a suspect in the lineup?

A. No.

Q. Okay. And so is that just something that you have remembered today?

A. No. I don't specifically remember saying there was a suspect. I told him there was somebody, a suspect, I just used that word, an individual.

Q. That's the issue we're here on right now. So it's very important that you are very specific about what you told [Tovar]. Take a minute and remember exactly what instructions you gave Mr. Tovar when you handed him that lineup.

(Pause in Proceedings)

A. Well I try and keep to the same script every time. What I–what I would tell them, and I'll say it is exactly as I always say to people: Okay. What we have are six individuals. The suspect may or may not be in the lineup. We can't tell you. You just need to let us know if anybody looks familiar.

Q. So is that what you remember telling Mr. Tovar, or what you said before? Which-

A. Well that's what I use every time. When I–I said, Well the suspect may be in there. I'm just going through–I was paraphrasing.

Prior to Leonard's testimony, the witness, Tovar, testified that he "knew exactly" what the suspect looked like and that he immediately recognized appellant's picture from the photo array without Leonard suggesting which picture to choose. Tovar also testified that, immediately after identifying appellant's picture from this photo array, he was shown another photograph of the back of appellant's head and that he recognized the tattoo on the back of appellant's head.

Q. [STATE]: And there came a time when you looked at a photo lineup and you did recognize someone. Is that correct?

A. [TOVAR]: Yes. Yes.

Q. Tell the Judge how–what instructions the detective gave you when he presented these photographs to you to look at?

* * *

A. I can't really say instructions. He just showed me, these are more pictures that we have here. See if, you know--

Q. Why was he asking you to look at photographs?

A. Because I–I knew exactly what he looked like. And I mean, I had described him completely. And the biggest thing I remember was the tattoo on the back of the head.

* * *

Q. Towards the end he showed you–Detective Leonard showed you a photo lineup

and you finally recognized someone in those pictures. Correct?

A. Correct.

Q. When he showed you–when he handed you that piece of paper with photographs on it, did he suggest to you in any way that you–that–what picture to choose from those photo lineups?

A. No. No.

Q. Did he tell you that you should pick someone out of that photo lineup?

A. No.

* * *

Q. When you finally did recognize someone, did you tell him immediately?

A. Before he put it on the table, I saw it and I said, That's him right there.

* * *

Q. [DEFENSE]: Did he tell you–what did the officer say to you after you identified [appellant]?

A. He was–he asked me, Are you sure? Well, he was–he was startled, because he–before he even put the paper down, That's him. Because I saw him facing forward. And like, I had already told him about the tattoo on the back. And he like, he was startled, right, that I pointed him out right away. And when he showed me the side picture of him, he asked me, Are you sure? Are you sure? He goes, Let me show you this. And that's when he showed me the side photo. And I go, Yeah; I told you that's him. That's the one.

* * *

Q. [STATE]: Did he also show you–after you had identified [appellant's] photograph and signed it and dated it, did he also show you a photograph then of a tattoo on the back of the head?

A. Yes.

Q. And did you recognize that tattoo?

A. Yes.

Tovar seemed to suggest on cross-examination, however, that Leonard told him that the six-person photo array contained a suspect; but then immediately seemed to suggest otherwise.

Q. [DEFENSE]: Did he tell you they had a new batch of suspects?

A. [TOVAR]: No. No.

Q. Did he tell you this–they had identified someone and you should look through this new batch?

A. The second time?

Q. Yeah.

A. The second time, yes; that they might have gotten somebody.

Q. So then–so they told you they might have gotten somebody and to--

A. You know what, I'm sorry. It was after. It was after the second time. I got a call from him. He told me, You know what, I think we might have identified–that's when he told me that they might have identified somebody that fit that description. Well, but I had already identified the picture. So it doesn't make sense. But--

The trial court recessed the proceedings for the day. The next day, the State argued to the trial court that the photo lineup was not impermissibly suggestive and that "Detective Leonard changed what he had initially said regarding whether he told [Tovar] . . . that there was a suspect in the lineup or not." The trial court denied appellant's motion to suppress Tovar's in-court identification and ruled:

> [TRIAL COURT]: All right. Here's my ruling. I've looked at the real-time that I have the benefit of here on the bench. I've looked at the cases. And let me just read into the record–so it doesn't have to be reviewed again. Let me go up to it. I know Detective Leonard's initial testimony was–I don't want to say it was unclear, but it–he was subsequently re-asked the question, what exactly did you tell him.

> But before I even address that issue, I've reviewed the testimony of Mr. Tovar. And I think on direct examination and cross examination the question came up repeatedly about being shown the photo lineup. And his answer here is best summarized when the question was posed: When he showed you–when he handed you the piece of paper with the photographs on it, did he suggest to you in any way that–what picture to choose from those photo lineups? And the answer was no. No. Question. Did he tell you you should pick someone out of that photo lineup? Answer. No.

Question. So what did he tell you when he put the photographs in front of you? Answer. He–he would hand them to me and, Look through these. You don't recognize no one? No (sic) look at these. Question. Okay. Answer. Look through this one–through this one. Question. When you finally did recognize someone, did you tell him immediately? Answer. Before he put it on the table, I saw it–his answer is: Before he put it on the table, I saw it and said, That's him right there. Question. Okay. I'm going to show you [the photo array]. Even though this is black and white, do you recognize this as a copy of photo lineup? Answer. Yes. Yes.

I think we all agree initially that Detective Leonard said something about when he initially handed him the photo lineup that it might have had a suspect. And he was subsequently re-asked that question on redirect or cross examination, I can't remember the order. The question came from the State. Let me just find it.

He was re-asked the question following some questions by [the defense]. And the State asked: Take a minute and remember exactly what instructions you gave Mr. Tovar when you handed him the lineup. And his answer was, Well I try to keep the same script every time. What I–what I–what I would tell them, and I'll say it exactly as it (sic) I would say it to people. Okay. What we have here are individuals. The suspect may or may not be in the lineup. We can't tell you. You just need to let us know if anybody looks familiar. Question. Is that what you remember telling Mr. Tovar, or what you said before? Which–Answer. Well, that's what I use every time. So that was his response. And having reviewed these cases and other cases, I can't find anything that stands for the proposition that after somebody's looked at some 900-plus photos if (sic) individuals who have not been identified are in those 900 photos it would render that lineup overly suggestive to where an in-court identification would be suppressible. So I'm going to deny the motion to suppress the photo ID at this time.[1]

---

[1]

No evidence was presented that appellant's photograph was among any of the other approximately 900 photographs that Tovar viewed prior to identifying appellant's photo from the six-person photo array at issue here. Leonard was unable say whether Tovar had previously viewed the other five photos in this array. Leonard testified:

Q. [DEFENSE]: He may have seen the other five–or he probably had seen the other five during all the other lineups that he had seen. Correct?

A. [LEONARD]: I have no way of knowing if he had seen them during all the mug book viewings because he went through several, several photographs. We're talking close to nearly 900 photographs he had gone through. The only point in this that I'm able to say is he never identified anybody after seeing so many individuals until he

(continued...)

Despite my concerns regarding the process employed, the trial court's decision is reviewed on appeal under an abuse of discretion standard. This record, viewed in the light most favorable to the trial court's ruling, supports the trial court's decision to deny appellant's motion to suppress Tovar's in-court identification of appellant connecting him to the extraneous aggravated robbery of Tovar. The trial court could have reasonably found that the process culminating in Tovar's identification of appellant was not impermissibly suggestive and that, even if the process was impermissibly suggestive, it did not create a substantial likelihood that Tovar misidentified appellant.

Notwithstanding this, any error in the trial court's ruling was rendered harmless when appellant later took the stand and admitted committing the aggravated robbery of Tovar[2] and also testified that he got a "rush" from breaking into peoples' homes while they were home and that he should be sentenced to death.

> Q. [STATE]: You mentioned that you were guilty of every crime that we proved up in the past week. Is that right?
>
> A. [APPELLANT]: I'm guilty of every crime you all brought up plus--
>
> Q. And you also indicated that there was some crimes that we hadn't brought up?
>
> A. Many crimes.
>
> * * *
>
> Q. The adrenaline rush that you were addicted to. Terrorizing people gave you a rush?

---

[1](...continued)
got to [appellant]. That's how positive he was.

[2]
*See Leday v. State*, 983 S.W.2d 713, 718 (Tex.Cr.App. 1998) (erroneous ruling admitting evidence is not reversible error when other such evidence is admitted without objection either before or after the complained-of ruling).

A. Not really terrorizing them, just the fact that I was in a home while they were there gave me a rush.

Q. You terrorized the McGloughlins. Correct?

A. Correct.

Q. You terrorized the D'Amicos. Correct?

A. Correct.

Q. You terrorized Vicky Calsada. Correct?

A. Correct.

Q. And that gave you a rush.

A. It did.

Q. And let's not forget Candido Tovar. You terrorized him too, didn't you?

A. Correct.

Q. And that gave you a rush?

A. It did.

* * *

Q. Isn't it a fact, Mr. Luna, that throughout the past year you have plotted, and planned, and schemed, and the scheme that you finally came up with was, if I tell this jury I want the death penalty, they're going to be so sickened by my crimes that they're going to give me what I don't want, which is, according to you, a life sentence. Isn't that what this little show is all about?

A. No. I don't see myself spending the rest of my life in prison. I get out I'll be 70 years old. What am I going to have? Everybody I know, my mom, my dad, chances are, they're going to be passed away. I ain't going to have nothing. I get out–I would have spent more life in prison in 40 years than I have spent in my whole life. So what would I have to lose. Given the death sentence I would be able to focus my attention on getting strengthened spiritually and not be sidetracked.

This is not no scheme. This is the truth. I'm not afraid of getting the lethal injection. I'm not afraid of death. So no, this is not no scheme.

* * *

Q. Let me make sure we have all this straight, Mr. Luna. You want this jury to

answer special issue number one, yes; that you are a future danger?

A. Because I am.

Q. And you want this jury to answer special issue number two, no; because there is no sufficient mitigating reason to spare your life. That's what you want. Correct?

A. Correct.

Q. No question about it?

A. No question about it.

Q. Are you going to give up all your appeals?

A. I'm not going to try to appeal to nothing.

Q. Okay. So you're done.

A. Yep.

Q. And that's what you want.

A. That's exactly what I want.

Q. And it's your testimony that this isn't some sort of little reverse psychology ploy?

A. No.

On this record, any error in the trial court's ruling admitting Tovar's in-court identification of appellant connecting him to the aggravated robbery of Tovar could not have affected the jury's answers to the special issues. With these comments, I join the Court's opinion.

Hervey, J.

Filed: October 29, 2008
Publish